FILED
IN OPEN COURT
OCT 22 2015
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA )
) CRIMINAL NO. 2:15cr126
v. )
)
LUMBER LIQUIDATORS, INC., )
)
Defendant. )

## STATEMENT OF FACTS

This Statement of Facts is part of the Plea Agreement between Lumber Liquidators, Inc., ("LL") and the United States Attorney's Office for the Eastern District of Virginia and the Environmental Crimes Section, Environment and Natural Resources Division of the United States Department of Justice. The Statement sets forth the legal framework, environmental context, and specific activities of LL, between October 2011 and September 2013 related to the criminal charges to which LL has agreed to plead guilty.

## I. BACKGROUND

### A. Legal Framework

1. Customs Law: U.S. companies importing merchandise from foreign countries must abide by all laws contained within Chapter 27 of the U.S. Criminal Code (Customs violations). The importer must file various documents, such as a U.S. Customs and Border Protection (CBP) Form 7501, describing the consignee, exporter, merchandise, applicable duty and country of origin. When merchandise contains timber products, the importer must also file a Plant and Plant Product Declaration, which is described further in the next paragraph. Under 18 U.S.C. § 542, (Entry of Goods by Means of False Statements), any company that makes a false statement on

PRH [illegible]

an import declaration, without reasonable cause to believe in the truth of that statement, is guilty of a felony violation.

2. The Lacey Act: The Lacey Act, 16 U.S.C. § 3371 *et seq.*, is one of the primary federal statutes employed to combat the illicit trafficking of wildlife and natural products. Relevant to this case, the Lacey Act prohibits the importation of illegally-harvested timber into the U.S. This prohibition helps to ensure, amongst other things, that the U.S. timber industry is competing on a level playing field. It also reduces the role of the U.S. as a driver of illegal timber harvest globally, such as in the Amazon rainforest or, in this case, the habitat of the last remaining Siberian tigers. The Lacey Act also requires importers of timber products to complete a Plant and Plant Product Declaration, commonly referred to as a "PPQ-505" or a "Lacey Act Declaration," and submit that declaration to the U.S. Department of Agriculture's Animal and Plant Health Inspection Service (USDA-APHIS). 16 U.S.C. § 3372(f)(1). This declaration requires an accurate description of the timber product imported, including the scientific genus and species, the total amount of timber product, and the country from which the timber was harvested. The declaration is intended to promote the exercise of due care in sourcing by importers, as well as provide data used by regulatory and enforcement bodies to inform compliance efforts.

3. CITES: The U.S., along with 180 other countries, is a party to the Convention on International Trade in Endangered Species (CITES). CITES is a multilateral treaty aimed at preventing the extinction of listed species of wild animals and plants by regulating the international trade in those listed species. There are three appendices of CITES-listed species. Relevant to this matter, Appendix III species are those that are





listed after a member country petitions the other CITES parties for assistance in controlling trade in the species.

**B. Environmental Background**

The Russian Federation's Far Eastern Federal District ("Far East Russia") is a remote area of Russia which sits between Siberia and the Pacific Ocean. Within Far East Russia is one of the last remaining old-growth temperate rainforests, consisting of mixed broadleaf and conifer species, such as Mongolian oak (*Quercus mongolica*) and Korean pine (*Pinus koreansis*). Mongolian oak is the only oak that grows in Far East Russia. *See* Map of Russian Federation, Appendix at 1.

The temperate forests of Far East Russia are home to the last remaining Siberian tigers (*Panthera tigris altaica*) and Amur leopards (*Panthera pardus orientalis*). There are only an estimated 450 Siberian tigers and 57 Amur leopards remaining in the wild. The primary contributors to the cats' risk of extinction are illegal logging and detrimental logging practices. The risk stems from the fact that the cats are dependent on intact forests for hunting. In addition, acorns and pine nuts are the primary food source for the cats' prey species, such as red deer, roe deer, and wild boar.

Extensive illegal logging in Far East Russia has been reported by the Russian government as well as non-governmental organizations ("NGOs"). Much of this illegally-logged wood is transported across Russia's eastern border into China where it is processed into such things as flooring and furniture. The U.S. is a significant market for Chinese-manufactured flooring and furniture.

In response to illegal logging and the decline in tiger populations, Korean pine was added to CITES Appendix III in October 2010. In June 2014, again in response to illegal logging and the decline in tiger populations, Mongolian oak was added to CITES Appendix III.



PRH [illegible]

**C. The Defendant**

Lumber Liquidators Holdings, Inc. ("LL Holdings") is a publicly-traded company incorporated under the laws of Delaware and headquartered in Toano, Virginia. LL Holdings is a holding company which serves as the parent company over direct and indirect subsidiaries which conduct its business. The defendant, Lumber Liquidators, Inc. ("LL Inc."), is a subsidiary of LL Holdings, and is the largest specialty retailer of wood flooring in North America. LL Inc. operates retail flooring stores and sells flooring products. Two of the wholly-owned subsidiaries of LL Inc. are Lumber Liquidators Services, LLC ("LL Services") and Lumber Liquidators Leasing, LLC ("LL Leasing"). LL Services procures and imports flooring products, operates warehouses, and transports product to LL Inc. facilities. LL Leasing contains the Lumber Liquidators Chinese Representative Office ("RO"), which is located in Shanghai, China. The RO is managed and directly controlled by LL Services, which operates the RO as a satellite office and pays LL Leasing for operation of the RO. For the purposes of this Statement of Facts, all parties and employees of direct and indirect subsidiaries of LL Inc. will be referred to hereinafter as "LL" or "LL employees"[1]

A significant aspect of LL's business is the importation of wood flooring from mills and manufacturers located outside of the U.S. LL sells these products in retail stores that LL operates throughout the U.S. At the times relevant to the offense conduct, the majority of LL's suppliers were located in China, where the flooring was manufactured. The timber used in the manufacturing, however, was often harvested in other countries and shipped to China. This

[1] For the purposes of the Plea Agreement, the defendant accepts responsibility for the actions of those subsidiaries and their employees that are described herein.



PRH RD GW LA

matter concerns timber originally harvested in Far East Russia and Myanmar, shipped to China, and then imported by LL in the form of wood flooring.

## II. OFFENSE CONDUCT

The parties stipulate that the following facts are true and correct. The parties recognize that the following facts do not represent the entirety of the government's evidence against LL. Had the matter proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt:

At all times relevant to this matter, LL purchased flooring that contained oak harvested in Far East Russia. Certain LL employees were aware that purchasing oak harvested in Far East Russia posed a significant compliance risk. LL's internal guidance listed "Russian oak" in the highest category of product risk; certain LL employees possessed NGO and governmental reports documenting illegal harvesting in Far East Russia; and an internal LL training from June 14, 2013, described Far East Russia as an area of high risk.

Despite LL's internal guidance and certain employees' knowledge of the risk associated with Russian oak, LL increased its purchases of Russian oak until around the time of the government's execution of search warrants at LL's Virginia offices on September 26, 2013. *See* Graph of LL Purchases from Russia, Appx. at 1. In the first quarter of 2011, LL imported two purchase orders of flooring made of Russian oak. By the third quarter of 2013, LL was importing nearly 60 purchase orders of Russian oak.

### A. Lumber Liquidators' Compliance Program

After the 2008 Lacey Amendments, LL engaged a third party to assist in developing a compliance plan, which resulted in the 2010 Lumber Liquidators Lacey Act Compliance Manual ("2010 Manual"). LL set forth numerous guidelines in the 2010 Manual, which included the following statements:



PRH
[illegible]

1. The manual would be made available to all departments and employees whose job function directly related to importation of wood products.
2. Employees were provided with specific websites to assist in determining the proper species of wood being imported.
3. LL should be "confident" in their declaration of country of harvest on all Lacey Act Declarations, at a minimum requiring government documents sanctioning harvest, transport, and export of the wood products.
4. Suppliers should supply all supplemental documentation showing country of harvest, legality of harvest, and chain-of-custody prior to shipment of the wood product.

    a. If a supplier did not provide the required supplemental documentation, the purchase order should be rescinded;
    b. If there was a "long-standing relationship" between LL and the supplier, the required documentation could be provided after shipment;
    c. LL would conduct periodic post-entry reviews and quarterly internal audits of all import paperwork and supporting documentation to ensure that all imports were legal and accurately declared. Quarterly reports of the audits were to be provided to management.

The 2010 Manual was neither widely distributed nor relied on. Some employees whose direct duties included Lacey Act compliance were not aware of the 2010 Manual's existence.

On January 10, 2012, LL Holdings produced a document entitled "Lacey Summary," which was intended to provide Lacey Act compliance rules and regulations for relevant LL employees, including employees and personnel in the recently-purchased China RO. The 2012 Lacey Summary included the following statements:

1. Every vendor and every species should be evaluated for compliance risk;
2. LL should re-source or discontinue working with vendors considered high risk;
3. LL should discontinue any products considered high risk;
4. All suppliers must provide documentation demonstrating legal harvest prior to importation, including where applicable:

    a. Certificates of legality;
    b. Certificates of origin;
    c. Harvest documents; and
    d. Phytosanitary certificates;

5. Employees should be aware of "red flags" when dealing with suppliers, such as:

    a. Suppliers who are reluctant to produce documentation of legal harvest;
    b. Incorrect, inconsistent, or imprecise paperwork or labeling; and
    c. An inability or unwillingness to answer questions about timber origin;



PRH ED

6. "Blind reliance on a vendor who promises (even in writing) that the wood was harvested legally" was insufficient.

Though LL did set forth requirements, LL did not comply with these internal requirements, employees did not take all of the actions required by the 2010 Manual and the Lacey Summary, and there was inadequate enforcement of the various requirements outlined in the 2010 Manual and the Lacey Summary.[2]

**B. False Declaration of Harvest Country (Counts One and Two)**

Beginning at some point prior to October 1, 2011, and continuing through at least February 2013, LL purchased finished solid oak flooring products from a Chinese business entity, known herein as "Company X." Company X is a manufacturer of flooring products. Some of the timber that Company X used to manufacture flooring was Mongolian oak from Far East Russia.

LL was required by law to submit a Lacey Act Declaration for each imported shipment of wood flooring from Company X. LL's regular practice was to have Company X complete the genus, species, country of harvest, and other substantive contents of the declaration; LL or its agent would then sign and submit the declaration to USDA-APHIS upon import. Unless otherwise specified, a shipment consisted of a standard 40-foot intermodal shipping container, which contains approximately 19,368 square feet ($ft^2$)/32.4 cubic meters ($m^3$) of solid oak flooring.

---

[2] Lumber Liquidators, Inc. admits guilt for the offenses that are the subject of this criminal proceeding. It does not stipulate that it took any illegal conduct with a deliberate or willful intent to violate the law. Deliberate or willful intent is not a required element of the crimes charged in this proceeding. The required intent for these crimes is referenced in each charge respectively.



PKH PD
SW

Between October 1, 2011, and January 30, 2012, LL purchased and imported 23 shipments of finished oak flooring from Company X. The accompanying Lacey Act Declarations for those 23 shipments, which form the basis of Count Two, contained false statements regarding the species and/or the country of harvest. These wood flooring shipments were sent from China to Norfolk, Virginia. After the importations, LL subsequently shipped and transported these wood products to LL warehouses, online retail customers and to LL's retail stores for sale in Virginia and other states. The 23 shipments totaled 382,290.08 $ft^2$ (614.73 $m^3$) of solid oak flooring, with an estimated retail value of $1,641,522.56, and resulted in an approximate profit to LL of $673,024.25.

The associated Lacey Act Declarations, which LL submitted to USDA-APHIS, stated that the flooring consisted of Mongolian oak harvested in Germany. In reality, Mongolian oak does not occur in Germany, but is the only type of oak harvested in Far East Russia. Information regarding the distribution of Mongolian oak is readily available on numerous public websites, including the websites provided in LL's 2010 Manual, which all showed that Mongolian oak does not occur in Germany.

Despite LL's internal guidance, LL did not enforce its requirement that Company X provide accurate documentation proving the species of timber, location of harvest, legality of harvest, or the chain-of-custody of the timber prior to LL's importation of the merchandise. Upon receipt of the unsigned PPQ-505 declarations, LL did not review the declarations for accuracy before submission. LL failed to exercise due care and consequently transported timber products that were in violation of the Lacey Act Declaration requirement.

Next, in February 2013, LL decided to transfer inventory from its Canadian warehouse to a U.S. warehouse. Because the products would be imported into the U.S., LL was required to submit a Lacey Act Declaration. In preparation, an LL employee, whose duties included Lacey



PRH

Act compliance, noticed that the products included oak products from Company X that did not have any supplemental documentation showing legal harvest, harvest location, or chain-of-custody. Company X was not able to provide supplemental documentation, so the employee reviewed documentation from previous Company X shipments. When reviewing the prior documentation, the employee determined that the previous declarations contained false statements because the declared species was Mongolian oak and the declared harvest country was Germany; the employee was aware, however, that Mongolian oak was not found in Germany. This same information was readily available in numerous public websites, including the websites provided in LL's 2010 Manual.

On approximately February 23, 2013, the employee sent an email to other employees within the Quality Assurance department, the RO Manager, and a member of the LL legal department. In the email, the employee noted that it was not possible that the previous declarations for Company X's products were accurate regarding the purported harvest of Mongolian oak from Germany.

Yet, between February 23, 2013, and August 30, 2013, LL purchased and imported 12 additional shipments of oak flooring from Company X and an additional Chinese supplier, which were declared as Mongolian oak harvested in Germany. The 12 shipments, which form the basis of Count One, totaled 276,434 $ft^2$ (385.48 $m^3$) of oak flooring, with an estimated retail value of $969,175.99, and resulted in an approximate profit to LL of $397,362.16.

Despite the inaccurate information on previous declarations from Company X, and despite internal guidance, LL did not adequately enforce its requirement that Company X provide accurate supplemental documentation to verify the correctness of any declarations prior to LL's importation of those products. After determining that previous information provided by



PRH
SW

Company X was false, LL did not have reasonable cause to believe in the truth of any subsequent declarations claiming that Mongolian oak was harvested in Germany.

**C. False Declaration of Species (Count Three)**

LL increased purchases of Russian oak flooring in 2012 and 2013. The majority of these purchases were from a China-based conglomerate that included another of LL's Chinese suppliers, known herein as "Company Y." Company Y is a part of group of companies that conduct a variety of timber-related activities, including the milling and manufacture of timber into flooring products that are then sold throughout the world. Company Y's corporate affiliates have operations in Northern China along the border with Russia, as well as in Far East Russia.

In May 2013, certain LL employees began cataloguing supplemental documentation collected for products that LL was purchasing out of China. The documentation was received by certain China RO personnel and entered into a spreadsheet ("tracking sheet") that was shared with certain employees in the U.S. Between May 29, 2013, and July 14, 2013, LL purchased and imported 35 shipments of solid oak flooring from Company Y, which form the basis of Count Three. These wood flooring shipments were sent from China to Norfolk, Virginia. After the importations, LL subsequently shipped and transported these wood products to LL warehouse facilities, to online retail customers and to LL's retail stores for sale in Virginia and other states. The 35 shipments totaled 677,880 $ft^2$ (1,134 $m^3$) of solid oak flooring, with an estimated retail value of $3,518,197.20, and resulted in an approximate profit to LL of $1,442,460.85.

Company Y provided LL with documentation showing a harvest concession within Far East Russia (which provides the lessee the right to log certain species within defined areas), chain-of-custody documents, and Russian phytosanitary certificates. The phytosanitary certificates for these shipments declared that the wood was Mongolian oak, which is the only species of oak that grows in Far East Russia. *See* Russian Phytosanitary Permit, Appx. at 2.

Certain RO personnel in China received the documents and entered identifying information for the harvest concession permit and phytosanitary permits into their tracking spreadsheet, which was then shared with an employee in the U.S.

Contrary to the supplemental documentation, the Lacey Act Declarations for each of the 35 shipments stated that the wood LL imported from Company Y was *Quercus petraea*, commonly called sessile oak, Welsh oak, or Irish oak. Welsh oak is considered a species that presents a low risk of being illegally harvested because its growing range is predominantly in European countries without significant documented illegal logging. Welsh oak does not occur in Far East Russia. Information showing the range and distribution of Welsh oak is widely available on the internet, including the websites provided in LL's 2010 Manual. At least one LL employee with Lacey Act responsibilities, prior to May 29, 2013, accessed websites which stated that *Quercus petraea* occurred in Europe and not Far East Russia.

Despite internal guidelines and despite documents showing that the wood was harvested in Far East Russia and therefore high risk, LL did not take the necessary measures, as outlined in the 2010 Manual and the Lacey Summary, to ensure that declarations were truthful prior to submission. Instead, LL increased purchases of Far East Russian timber products from Company Y in 2012 and 2013. Thus, LL failed to exercise due care and consequently transported timber products that were in violation of the Lacey Act Declaration requirement.

**D. Importation of Illegally Harvested Timber from Russia (Count Four)**

Between May 29, 2013, and September 23, 2013, LL purchased and imported 79 shipments of solid oak flooring from Company Y, which form the basis of Count Four. LL subsequently sold this wood flooring through LL's retail stores in Virginia and other states and through direct online sales. The 79 shipments totaled 2,559.6 $m^3$ (1,530,072 $ft^2$) of oak flooring, with an estimated retail value of $7,845,008.40, and resulted in an approximate profit of



PRH [illegible]

$3,216,453.44. As described in the previous section, Company Y provided LL with a harvest concession permit in Far East Russia, chain-of-custody documents, and phytosanitary certificates. All of the wood in these shipments was attributed to the same forest concession in the Khabarovsky Province of Far East Russia. The harvest concession permit stated that the total amount of Mongolian oak which could be harvested from that concession was 373 $m^3$.

When logging timber, however, not all of the allocated quantity will be "commercial" grade; branches, crowns, and other parts of the tree are deemed "firewood" or "brushwood" and cannot be used for flooring. Russian forestry experts estimate that, of the 373 $m^3$, the maximum amount of commercial timber would be approximately 300 $m^3$ - just over 9 shipments of 40-foot shipping containers filled with finished product.

The 79 shipments purchased and imported from Company Y, which were all represented to have been harvested from the same concession, totaled 2,494.80 $m^3$ (1,491,336 $ft^2$), or about 800% of the allowable harvest under the concession permit. Certain personnel from the RO noted the concession permit in their tracking sheet, and thus had access to information regarding the permissible amount of timber that could be obtained from Company Y under the concession permit. *See* Russian Harvest Concession Permit, Appx. at 3.

As early as March 4, 2013, certain LL employees and personnel in China were advised to be aware of overharvest due to recurring inaccuracies in documentation received from suppliers. For example, a U.S. employee with Lacey Act responsibilities emailed certain RO and U.S. employees, telling them that "the quantities of wood materials being harvested…should make sense and should be sufficient to cover the total quantity of products delivered to LL. If the supplier provides a harvest or transport permit showing a quantity less than what was delivered to LL, then there is likely a problem." Nevertheless, LL imported wood products from Company Y that exceeded the quantity permitted under the harvest permit.



PRH

Despite internal guidance, and despite documentation showing that the wood was harvested in Far East Russia and therefore high risk, LL did not take sufficient measures to ensure that the shipments from Company Y did not exceed the amounts allowable under the harvest permits. LL did not heed the "red flags" described in the 2010 Manual and the Lacey Summary, such as inconsistent, incorrect, or imprecise paperwork. Thus, LL failed to exercise due care and consequently imported timber products that were harvested and shipped in violation of Russian law.

**E. False Declaration of Harvest Country and Species (Count Five)**

In September 2012, two LL employees, both with Lacey Act responsibilities, traveled to China to visit suppliers. During that trip, they visited a wood products supplier in Shenzen, known herein as "Company Z." The reference to "Company Z" incorporates a related Chinese company that supplied LL and operated under the same Manufacturing Identification Code as its affiliate; LL treated both suppliers as being the same entity. During the September 2012 trip, the employees noticed that Company Z did not have any tagging or marking system, and did not supply any documentation showing harvest location. Upon their return, one of the LL employees wrote a report of the findings and the potential implication on Lacey Act compliance, which was provided to other employees.

Between September 2012 and September 2013, LL attempted to procure supplemental documentation showing legal harvest, harvest location, and chain-of-custody from Company Z, but LL was often unable to do so. In May 2013, LL completed a survey to determine which Chinese suppliers were able to provide appropriate supplemental documentation, and Company Z was consistently unable to do so. Yet contrary to internal guidance, at no time prior to the government's execution of search warrants on September 26, 2013, did LL cease importing from Company Z.



PRH ZWA

Between July 1, 2013, and September 10, 2013, LL purchased and imported 6 shipments of what was declared to be Indonesian big-leaf mahogany (*Swietenia macrophylla*) from Company Z, which form the basis of Count Five. These wood flooring shipments were sent from China to Norfolk, Virginia. After the importations, LL subsequently shipped and transported these wood products to LL warehouse facilities, to online retail customers and to LL's retail stores for sale in Virginia and other states. The 6 shipments totaled 143,086.08 $ft^2$ (238 $m^3$) of flooring, with an estimated retail value of $790,402.10, and resulted in an approximate profit to LL of $324,064.86.

LL considered mahogany a high-risk species due to illegal logging and overharvesting, and considered Indonesia a high-risk country due to reports of widespread illegal logging. Yet LL had ordered big-leaf mahogany and specified that the mahogany should be of Indonesian origin, as mahogany from South or Central America is regulated by CITES.

After the six shipments were imported into the U.S., Company Z provided LL with documentation showing that the timber products were not made with Indonesian mahogany, but were instead merpauh (*Swintonia floribunda*) from Myanmar. Company Z told certain LL employees that, in an effort to meet LL's price points and shipping requirements, it had substituted the Indonesian mahogany with merpauh from Myanmar. The documents accompanying the shipments showed that the timber had been exported from Myanmar by the Myanmar Timber Enterprise ("MTE"). At that time, U.S. companies were prohibited by the U.S. Treasury Department from doing business with the MTE. Contrary to internal guidance, and despite past problems with documentation, LL did not require Company Z to provide documentation showing location of harvest, legality of harvest, or chain-of-custody prior to importation. LL failed to exercise due care and consequently transported timber products that were in violation of the Lacey Act Declaration requirement.



PRH PD GW KA

ON BEHALF OF THE UNITED STATES:

John C. Cruden
Assistant Attorney General of the Environment
and Natural Resources Division

By: ______________________________
Patrick M. Duggan, Trial Attorney
Christopher L. Hale, Trial Attorney
Environmental Crimes Section
U.S. Department of Justice

Dana J. Boente
United States Attorney
Eastern District of Virginia

By: ______________________________
Stephen W. Haynie
Assistant United States Attorney
Eastern District of Virginia

Defendant's Signature: I hold the title of Chief Compliance and Legal Officer at the defendant corporation, and I am the authorized representative of the defendant corporation. I hereby stipulate that the above Statement of Facts is true and accurate, and that if this case had proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: Oct. 7, 2015 ______________________________
Jill Witter
Corporate Representative for
Lumber Liquidators, Inc.

Defense Counsel Signature: I am counsel for the defendant in this case. I have reviewed the above Statement of Facts with the defendant and his decision to stipulate to the accuracy of these facts is an informed and voluntary one.

Date: Oct. 7, 2015 ______________________________
Patrick R. Hanes, Williams Mullen, PC
Charles E. James, Jr., Williams Mullen, PC
Andrew O. Mathews, Williams Mullen, PC
Bruce A. Baird, Covington & Burling, LLP
Counsel for the Defendant



PRH
SGH

# APPENDIX




*Map of Russian Federation*




*Number of LL purchase orders, by quarter, of timber declared as having been harvested in Russia.*





*Declared means of conveyance*

[illegible] Railway station of Suifenhe

*Declared point of entry*

[illegible] in bulk

*Number and description of packages*

[illegible] None

*Distinguishing marks*

[illegible] *Name of produce and quantity declared*

Sawnlog ( Oak) [illegible] cubic meter

[illegible] Quercus mongolica

*Botanical name of plants*

[illegible]

This is to certify that the plants, plant products or other regulated articles described herein have been inspected and/or tested according to appropriate official procedures and are considered to be free from the quarantine pests specified by the importing contracting party and to conform with the current phytosanitary requirements of the importing contracting party, including those for regulated non-quarantine pests.

II. Дополнительная декларация - Additional declaration (11)

Contract № HLFY - 004 from 19.06.2012

*Russian Phytosanitary permit provided to LL showing the timber as Quercus mongolica (Mongolian oak).*

PRH
CJH



*Pages from the Russian harvest concession permit. The page on the left shows tracts which may be logged, while the page on the right shows the total amount of timber which can be logged (by species) during the period of the lease.*